# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

BRENT ALLAN MAXWELL,

       Plaintiff,

v.

OLMSTED COUNTY, OLMSTED
COUNTYADULT DETENTION
CENTER, STACY SINNER,
Director of Detention Services,

       Defendants.

**MEMORANDUM OF LAW & ORDER**
Civil No. 10-3668 (MJD/AJB)

---

Mark G. Stephenson, Stephenson & Sutcliffe, PA, Counsel for Plaintiff.

Gregory J. Griffiths and Hilary R. Stonelake, Dunlap & Seeger, P.A., Counsel for Defendants.

---

## I.    Introduction

This matter is before the court on Defendants' Motion for Summary Judgment. [Docket No. 23.] The Court heard oral argument on December 16, 2011.

## II.    Background

Plaintiff Brent Maxwell was involved in an automobile accident in 2003. (Maxwell Dep. 22:8-13.) The accident left him with severe injuries that

necessitated the amputation of his right leg and construction of an artificial hip and pelvis.  (Id. at 23:14-23.)  Maxwell now uses a prosthetic leg.  (Id. at 23:1-7.)

Maxwell was arrested on a warrant on July 20, 2009 and was incarcerated at the Olmsted County Adult Detention Center ("ADC") until October 2009.   At the time of his intake at the ADC, Maxwell completed "Initial Classification Listing" and "Mental Health Screening" forms in which he indicated that he suffered from Post-Traumatic Stress Disorder ("PTSD") and was taking the medications Trazodone and Zoloft.  (Griffiths Aff., Ex. B.)  An ADC nurse made orders allowing Maxwell to continue taking Trazodone and Sertraline, a generic substitute for Zoloft.  (Id., Ex. D.).

Because of his disability, Maxwell was placed in a cell on the first floor of the ADC, was allowed to use his prosthetic leg, and was issued a walker.  (Id., Ex. E.)  The ADC also made allowances for Maxwell to have access to rubbing alcohol and an electrical charger for his prosthesis.  (Id.)  Upon his request, he was given an extra mattress and pillow for support and comfort (id.), although Maxwell alleges that he made further requests for padding which were denied (see Maxwell Aff. ¶¶ 13-14).  Maxwell was also given permission to wear shorts

rather than the ADC's standard pants to avoid entanglements with his prosthesis.  (Id., Ex. F.)

Sometime on or before July 24, 2009, Maxwell informed ADC personnel that he also had an open prescription for the narcotic pain reliever Percocet.  (See id., Ex. G.)  Because it was ADC policy not to distribute narcotics "unless [they were] absolutely necessary" (Molella Dep. 13:17-18), ADC personnel contacted Maxwell's treating physician—Dr. Justice—to determine whether an alternate medication would suffice (Griffiths Aff., Ex. G).  On July 24, Dr. Justice wrote a prescription for Oxycodone—a generic substitute for Percocet.  (Id.)  Four days later, Dr. Justice apparently stopped Maxwell's Percocet/Oxycodone prescription and prescribed Ibuprofen, three times a day as needed, instead.  (Id.)  It appears that Maxwell did not receive any pain relievers until July 28, when he began receiving regular doses of Ibuprofen.  (Id., Ex. I.)  As discussed in further detail below, from July 28, 2009 until his release, Maxwell received doses of either Ibuprofen or Oxycodone. (Id.)  It is undisputed that Maxwell did not receive any counseling or treatment for his PTSD during his incarceration at the ADC.

As originally built, the ADC had "grab bars" in its showers to allow for easier access for inmates with disabilities.  (Sinner Aff. ¶ 5.)  The grab bars were

removed after an incident at a correctional facility in Sherburne County,

Minnesota in which one inmate beat another to death using a grab bar that had

been detached from the wall.  (Sinner Aff. ¶ 7.)  Prompted by discussions with

the ADC's architect, ADC officials decided to remove the grab bars and

accommodate disabled inmates on an individual basis.  (Sinner Aff. ¶¶ 10-11.)

According to Maxwell, it was very difficult for him to use the showers without

grab bars and, on or around September 15, 2009, he fell while using such a

shower.  (Griffiths Aff., Ex. F.)  He states that he repeatedly asked for accessible

shower facilities but that those requests went unanswered.  (Maxwell Dep. 30:15-

18, 31:10-32:5.)

On August 23, 2010, Maxwell filed a pro se complaint against Defendants

Olmsted County, the ADC, and Stacy Sinner, Director of Detention Services at

the ADC (collectively "the County").  In his complaint, Maxwell alleges

violations of the Americans with Disabilities Act ("ADA"), the Eighth

Amendment, and the Universal Declaration of Human Rights.  Maxwell claims

that the ADC failed to provide him with accessible bathing facilities, sufficient

padding, adequate mobility aids, his prescribed medications, and treatment for

his PTSD.  Maxwell was subsequently referred to counsel through the Pro Se

Project of the Minnesota Chapter of the Federal Bar Association.

The County now moves for summary judgment, arguing that there are no

genuine issues of material fact as to Maxwell's ADA and Eighth Amendment

claims and that Sinner is immune from suit.

## III.    Discussion

### A.      Standard

Summary judgment is appropriate if, viewing all facts in the light most

favorable to the non-moving party, there is no genuine dispute as to any material

fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ.

P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  The party seeking

summary judgment bears the burden of showing that there is no genuine dispute

as to any material fact.  Id. at 323.  Summary judgment is only appropriate when

"there is no dispute of fact and where there exists only one conclusion."

Crawford v. Runyon, 37 F.3d 1338, 1341 (8th Cir. 1994) (citation omitted).

"Only disputes over facts that might affect the outcome of the suit under

the governing law will properly preclude the entry of summary judgment."

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  "Factual disputes that

are irrelevant or unnecessary will not be counted." Id. "[I]n ruling on a motion

for summary judgment, the nonmoving party's evidence 'is to be believed, and

all justifiable inferences are to be drawn in [that party's] favor.'" Hunt v.

Cromartie, 526 U.S. 541, 552 (1999).

**B.    Initial Matters**

Maxwell's pro se complaint contained some errors which he has since

acknowledged.  For one, Maxwell has conceded that his claims under the

Universal Declaration of Human Rights ("UDHR") are "off the table."  (Maxwell

Dep. 18:22.)  Maxwell has also conceded that since his Eighth Amendment claims

are against municipal actors, not federal officers, they are most appropriately

brought pursuant to 42 U.S.C. § 1983, not Bivens v. Six Unknown Named Agents

of Federal Bureau of Narcotics, 403 U.S. 388 (1971).

The Court will therefore dismiss Maxwell's UDHR claims and construe his

Bivens claims as § 1983 claims.  See Fed. R. Civ. P. 8(e) ("Pleadings must be

construed so as to do justice."); see also Davis v. Hall, 992 F.2d 151, 152 (8th Cir.

1993) ("Civil rights pleadings are construed liberally."); Whitson v. Stone Cnty.

Jail, 602 F.3d 920, 922 n.1 (8th Cir. 2010) ("[A] pro se complaint must be liberally

construed.") (citations omitted).

### C.    Maxwell's ADA Claims

#### 1.  Standard

Maxwell has asserted that the County violated his rights under Title II of the ADA ("Title II"), which provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.

Title II applies to programs and services offered by state and local correctional facilities.  See Pa. Dep't of Corr. v. Yeskey, 524 U.S. 206, 210 (1998). "[D]eliberate refusal of prison officials to accommodate [an inmate's] disability-related needs in such fundamentals as mobility, hygiene, medical care, and . . . prison programs" may constitute a violation of Title II.  United States v. Georgia, 546 U.S. 151, 157 (2006); see Phipps v. Sheriff of Cook Cnty., 681 F. Supp. 2d 899, 916 (N.D. Ill. 2009) (collecting cases holding that "showering, toileting, and lavatory use [are] regarded as programs and/or services under the ADA.")

Of course, the right to reasonable accommodations is not absolute. Correctional facilities are not liable for failing to provide accommodations which were not requested, nor are they required to provide preferential treatment to

disabled inmates.  <u>Randolph v. Rodgers</u>, 170 F.3d 850, 858 (8th Cir. 1999); <u>Lue v. Moore</u>, 43 F.3d 1203, 1206 (8th Cir. 1994).  Moreover, a defendant may defeat a Title II claim by "demonstrat[ing] that the requested accommodation would constitute an undue burden."  <u>Randolph</u>, 170 F.3d at 858.  Title II does not require "jails or prisons to take actions that unduly jeopardize their safety and security."  <u>See</u> <u>Baribeau v. City of Minnneapolis</u>, 578 F. Supp. 2d 1201, 1221 (D. Minn. 2008) (Ericksen, J.), <u>aff'd in part and rev'd on other grounds</u>, 596 F.3d 465, 484 (8th Cir. 2010).

There is no dispute between the parties that Maxwell is a "qualified individual with a disability" under Title II.  The question here is whether the County failed to provide him accommodations such that he was, "by reason of" his disability, "excluded from participation in or denied the benefits of the jail's services, programs, or activities, or was otherwise subjected to discrimination by the jail."  <u>Baribeau</u>, 596 F.3d at 484.

Maxwell has claimed Title II violations due to the County's failure to provide him with (1) accessible bathing facilities, (2) adequate padding for support and to alleviate his pain, (3) crutches, (4) prescribed medication, and (5) treatment for his PTSD.

8

## 2.  Accessible Bathing Facilities

Maxwell argues that the County violated Title II by failing to provide accessible bathing facilities through its removal of grab bars from the showers in the ADC and its failure to provide alternate accommodations.

The ADC's showers were originally built with grab bars to assist disabled inmates.  The County contends that its subsequent decision to remove the grab bars was reasonable in light of an incident in another county where one inmate beat another to death with a grab bar that had been removed from the wall.  The County further argues that it is entitled to summary judgment because Maxwell did not request an accessible shower and because the absence of grab bars on the ADC's showers did not prevent Maxwell from accessing the ADC's services or programs.

The County's decision to remove the grab bars was prompted by communication from the architects who designed the ADC.  In response to the Sherburne County incident, the architects indicated that the grab bars could pose "life safety" concerns and recommended that that the grab bars be removed until a better solution could be found.  (Sinner Decl., Ex. C.)  Sinner has stated that she decided that the grab bars should be removed (except for those in the medical

9

unit) and that "it was safest to provide reasonable accommodations to detainees with special needs on an as-needed basis."  (Sinner Decl. ¶ 11.)

Maxwell responds that since grab bars are required under sections of 28 C.F.R. § 36, nothing could justify their removal and that "there is no question of whether or not requiring grab bars in showers is reasonable."  The regulations codified at 28 C.F.R. § 36, however, implement <u>Title III</u> of the ADA, which applies to private entities in places of public accommodation.  A state and county correctional facilities are not covered by Title III.  <u>See</u> <u>White v. Secor</u>, No. 7:10-cv-428, 2010 WL 4630320 at *2 (W.D. Va. Nov. 5, 2010) (collecting cases).  Thus, a violation of Title III is not as conclusive as Maxwell argues and does not demonstrate a per se violation of Title II.  The question here is whether the ADC provided reasonable accommodations such that Maxwell was not denied benefits, services, or programs provided by the ADC.

Even if the County's decision to remove the grab bars may have been justified by safety concerns brought to light by the incident in Sherburne County, it is not clear that the County provided Maxwell with reasonable alternative accommodations.  The County repeatedly argues that it could not have known to provide accommodations which were not requested.  If the undisputed evidence

showed that Maxwell had never requested an accommodation, summary judgment might be warranted.  The facts, however, are disputed.

In his deposition, Maxwell stated that he was unsure if he had made a shower accommodation request in writing, but he also stated that he had made continual verbal requests to ADC personnel for accessible shower or bathtub facilities.  (Maxwell Dep. 30:15-18, 31:10-32:5.)  In response, the County notes that in the many numerous written requests ("kites") that Maxwell made while incarcerated, none included a request shower accommodations.  (See Griffiths Aff., Ex. J.)  The County further notes that Maxwell has admitted that, on one occasion, a doctor in the ADC's Medical Unit told Maxwell that an accessible bathtub was available "someplace."  (Maxwell Dep. 38:23-39:2.)

There is a basic factual conflict as to whether Maxwell requested an accessible shower or bathtub and whether such accommodations were provided. Moreover, a doctor's stray remark that an accessible bathtub was available "someplace" is not conclusive evidence of reasonable accommodation of Maxwell's disability.   If Maxwell in fact made requests for accessible bathing facilities, and those requests went unanswered by the ADC, he was denied access to a fundamental service or benefit under Title II.  See United States v. Georgia,

546 U.S. at 157; <u>Phipps</u>, 681 F. Supp. 2d at 916.  While legitimate safety concerns might explain the ADC's decision to remove the grab bars from the ADC's showers, they cannot explain a failure to provide <u>any</u> bathing accommodations.

The County argues in the alternative that even if Maxwell were to show that he was denied accessible bathing facilities, he cannot show that such a denial was "because of his disability."  The County seems to contend that Maxwell must show that any denial of services or benefits at the ADC was motivated by his disability.  This theme, which runs throughout the County's arguments in support of summary judgment, misses the mark.  While evidence of intentional discrimination is <u>one</u> way to prove a Title II claim, it is not the <u>only</u> way to prove such a claim.  <u>See</u> <u>Washington v. Ind. High Sch. Athletic Ass'n</u>, 181 F.3d 840, 846 (7th Cir. 1999) ("We cannot accept the suggestion that liability under Title II of the Discrimination Act must be premised on an intent to discriminate on the basis of disability.").  Title II discrimination "may be established by evidence that (1) the defendant intentionally acted on the basis of the disability, (2) the defendant refused to provide a reasonable modification, <u>or</u> (3) the defendant's rule disproportionally impacts disabled people."  <u>Id.</u> at 847 (emphasis added).

Here Maxwell's claim clearly falls under the second category; he alleges that the ADC failed to reasonably accommodate his disability.

Viewing the evidence in the light most favorable to Maxwell, his reasonable accommodation claim based on the lack of accessible bathing facilities must survive summary judgment.  There is no dispute that the ADC removed grab bars from its showers.  Maxwell has testified that it was extremely difficult for him to use the shower without grab bars.  (Maxwell Dep. 36:15-25.)  As verified in the ADC's medical records, he suffered a fall while attempting to use the shower.  (Griffiths Aff., Ex. F.)  Because material factual disputes remain with respect to Maxwell's accommodation requests and the ADC's response to any such requests, the Court will deny summary judgment as to this claim.

### 3.  Adequate Padding

Maxwell alleges that the County further violated Title II by refusing his requests for additional padding which would have allowed him to avoid pain arising from his disability.  He alleges that while he had been provided with more substantial padding at two other counties' correctional facilities, at the ADC he was provided only "two very old one inch thick mattresses and two one inch thick pillows."  (Maxwell Aff. ¶¶ 13-14.)  He alleges that he repeatedly

requested more padding but that his requests were rejected.  (Id. ¶ 17.)   The

County contends that it provided Maxwell with padding whenever he requested

it.  It notes that Maxwell has admitted that he received a second mattress and

pillow when he initially asked for extra padding.  (Maxwell Dep. 32:6-14.)

The County urges that summary judgment is appropriate because the only

document corroborating Maxwell's allegations is his own affidavit.  In support,

the County cites Conolly v. Clark, 457 F.3d 872, 876 (8th Cir. 2006), a case in

which the District Court properly discounted a self-serving affidavit which

contradicted other objective evidence in the record.  Here, Maxwell's affidavit

elaborates on his deposition testimony but does not contradict any of his

previous statements or other evidence in the record.  The question of whether

Maxwell continued to request additional padding ultimately comes down his

credibility as a witness, and "[c]redibility determinations and the weighing of the

evidence are jury functions, not those of a judge."  Wierman v. Casey's Gen.

Stores, 638 F.3d 984, 993 (8th Cir. 2011).

Because there remains a genuine issue of material fact with respect to the

ASC's provision of padding as requested by Maxwell to relieve the pain he

suffered as a result of his disability, the Court will deny the County's motion for summary judgment as to that claim.

### 4. Mobility Aids

Maxwell argues that the County violated Title II a third time when it denied him access to crutches that he requested. He states that, without crutches, he was forced to move about his cell without any mobility devices, particularly at night when he removed his prosthetic leg.

The County argues that it provided Maxwell with adequate mobility aides. For one, ADC personnel allowed Maxwell to keep and use his prosthetic leg. Cf. Baribeau, 596 F.3d at 482-484 (holding that confiscation of prosthetic leg was reasonable in light of legitimate security concerns at jail). The County further notes that Maxwell was housed on the first floor of the ADC and that he was provided a walker which served as an alternate mobility aid. Finally, the County asserts that any decision not to provide crutches to Maxwell was based on security concerns that a crutch could be used as a weapon.

Here is it not clear that the ADC's reluctance to provide Maxwell with crutches "excluded [him] from participation in or be denied [him] the benefits of the services, programs, or activities" at the ADC. Id. at 484. Maxwell admits that

that the ADC took steps to provide him with mobility aids, and he has not

explained how the mobility aids that the ADC provided were insufficient to

accommodate his disability or prevented him from moving about the ADC.

Without more, a reasonable juror could not conclude that the County's provision

of a walker rather than crutches constituted a violation of Title II.  The Court will

therefore grant the County's motion for summary judgment as to Maxwell's Title

II claim relating to mobility aides.

### 5.  Medical Treatment Claims

Maxwell claims that the County further violated Title II by failing to

provide him his prescribed pain medications and treatment for PTSD.  A claim

under the ADA, however, "cannot be based on medical treatment decisions."

Burger v. Bloomberg, 418 F.3d 882, 883 (8th Cir. 2005) (per curiam).  For this

reason, those claims are better addressed in the Eighth Amendment context.

### D.  Maxwell's Eighth Amendment Claims

### 1.  Standard

Under 42 U.S.C. § 1983, a plaintiff may maintain a cause of action against

state actors or those acting under the color of state law for "the deprivation of

any rights, privileges, or immunities secured by the Constitution and laws" of

the United States.  See Wagner v. Jones, 664 F.3d 259, 268 (8th Cir. 2011).  The

Eighth Amendment's prohibition of cruel and unusual punishment is "violated if

prison officials show 'deliberate indifference' to the prisoner's 'serious medical

needs.'" Olson v. Bloomberg, 339 F.3d 730, 735 (8th Cir.2003) (quoting Estelle v.

Gamble, 429 U.S. 97, 104-05 (1976)).  A claim of deliberate indifference "involves

both an objective and a subjective component."  Dulaney v. Carnahan, 132 F.3d

1234, 1239 (8th Cir. 1997).  The plaintiff must "demonstrate (1) that [he or she]

suffered objectively serious medical needs and (2) that the prison officials

actually knew of but deliberately disregarded those needs."  Id.

The Eighth Circuit has explained that a "serious medical need" is "one that

has been diagnosed by a physician as requiring treatment, or one that is so

obvious that even a layperson would easily recognize the necessity for a doctor's

attention." Schaub v. VonWald, 638 F.3d 905, 914 (8th Cir. 2011) (citation

omitted).  While verifying medical evidence is generally needed, a medical need

that would be obvious to a layperson does not require such evidence.  Id.

"Deliberate indifference may be manifested by prison doctors in

responding to the prisoner's needs or by prison officials in intentionally denying

or delaying access to medical care or intentionally interfering with prescribed

treatment." <u>Meloy v. Bachmeier</u>, 302 F.3d 845, 849 (8th Cir. 2002).  However, "[t]he prisoner must show more than negligence, more even than gross negligence, and mere disagreement with treatment decisions does not rise to the level of a constitutional violation."  <u>Jolly v. Knudsen</u>, 205 F.3d 1094, 1096 (8th Cir. 2000) (citations omitted).

Maxwell claims that ADC officials violated his Eight Amendment rights by refusing to provide (1) prescribed medications, (2) additional padding, (3) accessible bathing facilities, (4) appropriate mobility aides, and (5) PTSD treatment.

### 2.  Denial of Medication

Maxwell entered the ADC with prescriptions for a number of medications, but his Eighth Amendment claim focuses on his allegation that the ADC denied him access to Percocet, a narcotic pain reliever, which in its generic form is known as Oxycodone.

When Maxwell first came to the ADC on July 20, 2009, he had an open prescription for Percocet.  (Maxwell Dep. 41:21-42:6.)  ADC records indicate that, on his first day in the ADC, Maxwell had indicated that he was taking two prescription medications—Trazodone, a sleep medication, and Zoloft—but not

18

Percocet.  (Griffiths Aff., Ex. B.)  After a medical examination on the same day, a

nurse ordered that he receive Trazodone and Sertraline, a generic substitute for

Zoloft.  (Id., Ex. D.)  Two days later, on July 22, 2009, ADC medical notes indicate

that Maxwell's Trazodone dosage was increased to help him sleep.  (Id., Ex. H.)

At some point between July 20 and July 24, Maxwell apparently made

ADC personnel aware of his Percocet prescription.  According to Dr. Molella, the

ADC's Medical Director, it was the ADC's policy to avoid prescribing narcotics

to inmates, unless such medications are medically necessary.  (Molella Dep.

13:17-18.)  ADC records indicate that medical staff contacted Maxwell's treating

physician, Dr. Justice, regarding the narcotic prescription on July 24.  (Griffiths

Aff., Ex. G.)  On that day, Dr. Justice wrote a prescription for Oxycodone—a

generic substitute for Percocet, to be taken three times per day as needed.

(Griffiths Aff., Ex. H.)  The ADC's Medication Administration Record

nonetheless indicates that Maxwell did not receive any pain medication until

July 28, 2009, when Dr. Justice appears to have discontinued the

Percocet/Oxycodone prescription and written a new prescription for Ibuprofen,

to be taken three times per day as needed.  (Id., Exs. G, I.)

From July 28 until August 14, 2009, it appears that Maxwell received between one and three doses of Ibuprofen.  (Id., Ex. I.)  On August 14, Maxwell met with Dr. Molella, who prescribed Oxycodone, to be taken three times a day as needed.  Maxwell then began taking the Oxycodone.  (Id.)  This regimen continued until September 5, 2009, when Maxwell began to receive Ibuprofen, rather than Percocet, two to three times per day.  (Id.)  From September 9 through September 15, Maxwell received Oxycodone twice per day.  (Id.)  From September 16 through his release, Maxwell received Oxycodone three times per day.  (Id.)

Maxwell argues that the ADC violated his Eighth Amendment rights when it denied his request for Percocet during the first 25 days of his incarceration at the ADC and also during the periods when he received Ibuprofen instead of Oxycodone or received only two doses of Oxycodone.

The record is not altogether clear on this point, but the ADC's provision of Ibuprofen from July 28 to August 14 may have been pursuant to the instructions of Maxwell's own treating physician.  Likewise, the changes in September appear to have been made pursuant to a decision of a Nurse Practitioner, who became concerned that Maxwell was abusing his Oxycodone prescription.  (Griffiths Aff.,

20

Ex. F.)  During that time, Maxwell received Ibuprofen.  (Id., Ex. I.)  Maxwell is

required to show "more than negligence, more even than gross negligence."

Jolly, 205 F.3d at 1096.  "[M]ere disagreement with treatment decisions does not

rise to the level of a constitutional violation."  Id.  Thus, the ADC's decisions to

deny Maxwell his prescribed pain medication may not always have risen to the

level of Eighth Amendment violations.

The Court notes, however, that there appear to have been times when

Maxwell did not receive any of his prescribed pain medication.  The ADC has

failed to explain, for example, why prescribed pain medication was not made

available to Maxwell until July 28—eight days into his incarceration.  By all

accounts, Maxwell was suffering, and he alleges that he told ADC personnel that

he needed this prescribed pain medication.

Maxwell's allegation as to this claim, and the evidence that supports it,

therefore satisfy the two-part inquiry required for Eighth Amendment deliberate

indifference claims.  First, as evidenced by the multiple doctors who prescribed

him strong pain relievers, Maxwell's physical condition qualifies as an

"objectively serious medical need" that had been "diagnosed by a physician as

requiring treatment."  Schaub, 638 F.3d at 914.  Second, in light of Maxwell's

testimony that he requested pain medication and the ADC's own documents

showing that he did not receive it, a reasonable juror could conclude "that [ADC]

officials actually knew of but deliberately disregarded" his serious medical

condition.  Id.

For these reasons, the Court will deny Defendants' motion for summary

judgment as to Maxwell's Eighth Amendment claim based on the ADC's failure

to provide him with prescribed pain medication.

### 3.  Adequate Padding

Maxwell further argues that the ADC's failure to provide him with

additional padding caused him significant pain and therefore violated his Eighth

Amendment rights.  As discussed above, Maxwell alleges that he asked for

additional padding and that ADC personnel refused his requests.  The County

denies that Maxwell requested additional padding after he received an extra

pillow and mattress at the beginning of his incarceration.

As already established, Maxwell's painful physical condition qualifies as a

"serious medical need" that "has been diagnosed by a physician as requiring

treatment."  Schaub, 638 F.3d at 914.  Second, viewing the facts in the light most

favorable to Maxwell, a reasonable juror could conclude "that the prison officials

22

actually knew of but deliberately disregarded" his serious medical condition by failing to provide him with adequate padding when he requested it.  Id.

For these reasons, the Court will deny summary judgment as to Maxwell's Eighth Amendment claim based on the ADC's failure to provide him with adequate padding.

### 4.  Accessible Bathing Facilities

"[N]ot all unsafe conditions are cruel and unusual punishment under the Eighth Amendment."  Standish v. Bommel, 82 F.3d 190, 191 (8th Cir. 1996). Rather, "to violate the Eighth Amendment, a condition must 'involve the wanton and unnecessary infliction of pain'" by creating an "objectively serious safety risk" through "deliberate indifference."  Id. (citations omitted).

Maxwell argues that the absence of grab bars in ADC showers, coupled with the ADC's refusal to provide him with accessible bathing facilities, created an objectively serious safety risk.  He relies on the same arguments which support his ADA claim:  The ADC did not provide him with reasonable alternate accommodations, which caused him to struggle as he showered and led to a painful fall.  As above, the County contends that it provided Maxwell with all of the accommodations that he requested, that the removal of the grab bars was

justified by security concerns, and that its actions do not amount to deliberate indifference to Maxwell's disability.

A genuine issue of material fact remains as to this claim.  If a jury finds that ADC officials were aware that the standard showers were unsafe for Maxwell and yet did nothing to accommodate his disability, such conduct may rise to the level of "wanton and unnecessary infliction of pain."  See Standish, 82 F.3d at 191.  The Court will therefore deny the County's motion for summary judgment as to Maxwell's claim relating to denial of accessible bathing facilities.

### 5.  Mobility Aids

Maxwell further argues that the ADC violated the Eighth Amendment when it provided him with an "old unstable walker" rather than the crutches that he had requested.  He states that, without crutches, he was forced to move about his cell without any mobility devices, particularly at night when he removed his prosthetic leg.  The County again argues that it provided Maxwell with adequate mobility aides by allowing Maxwell to keep and use his prosthetic leg and by providing him with a walker.  The County also argues that its decision not to provide crutches was based on legitimate security concerns.  See Baribeau, 596 F.3d at 482-484.

For the same reasons that the Court grants summary judgment on this aspect of Maxwell's ADA claim, the Court will grant the County summary judgment on this aspect of his Eighth Amendment claim. Maxwell has not explained how the ADC's decision to provide him with a walker rather than crutches amounted to "deliberate indifference" to his serious medical needs.

**6. PTSD Treatment**

Maxwell argues that the ADC's failure to treat his PTSD constitutes a violation of his Eighth Amendment rights. The undisputed evidence shows that Maxwell indicated that he had PTSD upon intake to the ADC and that he did not receive any treatment for that disorder while incarcerated at the ADC. At the same time, Maxwell has admitted that he "does not remember whether" he requested counseling while incarcerated. (Maxwell Dep. 51:2-4). Maxwell has further stated that, when he did speak with Dr. Molella about his PTSD, it was in the context of asking for an increased dosage of his previously prescribed medications. (Maxwell Dep. 52:8-25.)

Without more, a reasonable juror could not find that ADC personnel were deliberately indifferent to Maxwell's psychological needs. Although they were aware of Maxwell's PTSD, the undisputed evidence shows that Maxwell himself

did not ask for additional treatment beyond the medications which had already

been prescribed to him.  While the ADC might have been more proactive in

providing additional treatment to Maxwell, its actions with respect to this issue

seem a far cry from "intentionally denying or delaying access to medical care or

intentionally interfering with prescribed treatment."  <u>Meloy</u>, 302 F.3d at 849.

The Court will grant the Defendants' motion for summary judgment as to this

aspect of Maxwell's Eighth Amendment claim.

> **E.    Immunity of Director Sinner**

For the reasons discussed below, the Court concludes that Director Sinner

is immune from suit in this case.

> **1.  ADA Claims**

Title II of the ADA provides for redress from "public entities."  <u>See</u> 42

U.S.C. § 12132.  The definition of "public entity" at 42 U.S.C. § 12131(1) does not

include individuals.  <u>See</u> <u>Alsbrook v. City of Maumelle</u>, 184 F.3d 999, 1005 n.8

(8th Cir. 1999) (en banc).  For this reason, Maxwell's Title II claims should be

aimed at the ADC and Olmsted County, not at Sinner.  <u>See</u> <u>Baribeau</u>, 596 F.3d at

484 (holding Title II claims against county employees in their personal capacities

are properly dismissed at summary judgment and construing Title II claim

26

against "county employees in their official capacities as a suit against the County"). The Court will therefore dismiss the individual claims against Sinner and will construe any claim against Sinner in her official capacity as a claim against the ADC and Olmsted County.

### 2. Eighth Amendment Claims

Sinner further argues that she is entitled to qualified immunity with respect to Maxwell's Eighth Amendment claims. The Eighth Circuit recently addressed the qualified immunity of prison officials in the Eighth Amendment context in Langford v. Norris, 614 F.3d 445, 460 (8th Cir. 2010). In Langford, the Court explained that a prison official is not entitled to qualified immunity where (1) the facts, construed in the light most favorable to the plaintiff, establish a violation of the plaintiff's Eighth Amendment rights, (2) those rights were clearly established at the time of the violation, and (3) the prison official knew or should have of the violation "yet remained indifferent." Id. at 460-61; see also Smith v. Marcantonio, 910 F.2d 500, 501 (8th Cir. 1990).

The Eighth Amendment's prohibition of deliberate indifference to an inmate's serious medical needs is well-established. Langford, 614 F.3d at 459. This Court has already concluded that some of Maxwell's Eighth Amendment

claims survive summary judgment, so the remaining question is whether Sinner

knew or should have known of the deliberate indifference alleged by Maxwell.

Id. at 460-61.

The County points out that it is undisputed that Sinner had no contact

with Maxwell during his incarceration at the ADC.  Maxwell did not

communicate any of his complaints to her.  Maxwell's argument in response is

that Sinner was aware of the removal of grab bars from the shower and of the

ADC's implementation of a case-by-case accommodation plan.  Maxwell also

argues that Sinner was aware of "policies" at the ADC which deprived him of

adequate pain relief, padding, psychological treatment, and mobility devices.

"[P]rison supervisors . . . cannot be held liable under § 1983 on a theory of

respondeat superior."  Langford, 614 F.3d at 460.  Absent evidence establishing

that Sinner had been notified about Maxwell's grievances and disability, Sinner

cannot be said to have been personally aware of the alleged Eighth Amendment

violations by way of her knowledge of facility-wide policies.  Cf. Langford, 614

F.3d at 461-62 (finding no qualified immunity where prison official

acknowledged personally receiving letters from plaintiffs about untreated

medical conditions).  While Skinner may have been responsible for the removal

28

of the grab bars from the shower, that decision does not, on its own, constitute an

Eighth Amendment violation.  For these reasons, the Court will also dismiss

Maxwell's Eighth Amendment claims as to Sinner.


Accordingly, based upon the files, records, and proceedings herein, **IT IS**

**HEREBY ORDERED:**

Defendants' Motion for Summary Judgment [Docket No. 23] is
**GRANTED IN PART** and **DENIED IN PART** as follows:

a.  Plaintiff's ADA claims relating to denial of (1) accessible bathing
    facilities and (2) adequate padding **REMAIN**.  All other ADA claims
    are **DISMISSED**.

b.  Plaintiff's Eighth Amendment claims relating to denial of (1)
    prescribed pain relievers, (2) accessible bathing facilities, and (3)
    adequate padding **REMAIN**.  All other Eighth Amendment claims
    are **DISMISSED**.

c.  Plaintiff's claims against Defendant Stacy Sinner are **DISMISSED**.


Dated:  February 13, 2012               s/ Michael J. Davis
                                        Michael J. Davis
                                        Chief Judge
                                        United States District Court